1539

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | 20-342 |
| v. | ) | Criminal No. (18 U.S.C. §§ 2 and 371 and |
| | ) | 33 U.S.C. §§ 1317 and 1319(c)(2)(A)) |
| GLENN LIJEWSKI | ) | [UNDER SEAL] |

INDICTMENT

The grand jury charges:

FILED

COUNT ONE

NOV 12 2020

INTRODUCTION

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

At all times relevant to this Indictment:

1. The Pittsburgh Water and Sewer Authority ("PWSA"), not a named defendant herein, was a municipal corporation organized by the City of Pittsburgh on February 17, 1984, pursuant to the laws of the Commonwealth of Pennsylvania. The PWSA had an Executive Director who reported to a Board of Directors.

2. The PWSA became responsible in the 1990s for providing drinking water to residential, commercial, and industrial customers within the City of Pittsburgh. The PWSA also sold drinking water to neighboring municipalities.

3. The Allegheny River was a "navigable water" within the meaning of the Clean Water Act, 33 U.S.C. § 1362(7) (hereinafter referred to as the "Act.").

4. The PWSA operated a drinking water production facility known as the "Plant" or the "Aspinwall Plant," located on the right, downward bank of the Allegheny River. Drinking water operators, laborers, scientists, and supervisory personnel were employed by the PWSA at the Plant.

5. The defendant, GLENN LIJEWSKI, was employed by the PWSA at the Aspinwall Plant and held several different positions, including being a first-line and second-line supervisor, during the course of his lengthy career. By the time he retired from the PWSA in April, 2017, the defendant, GLENN LIJEWSKI, had supervised for a period of years the plant operators and laborers at the Aspinwall Plant who helped transform raw river water into potable drinking water. In this role, the defendant, GLENN LIJEWSKI, inter alia, was responsible for making decisions concerning the maintenance of the machinery used during the drinking water production and treatment process. The defendant, GLENN LIJEWSKI, was also responsible for determining when the Plant's water clarifiers used to remove contaminants and pollutants from river water were taken out of commission for maintenance and for cleaning and complying with environmental laws and regulations governing such activities.

## THE CLEAN WATER ACT

6. Section 301(a) of the Clean Water Act; 33 U.S.C. § 1311(a), prohibited the discharge of any pollutant into the waters of the United States by any person or entity except in accordance with the Act and a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

7. Under Section 402(a) of the Act, 33 U.S.C. § 1342(a), the Administrator of the United States Environmental Protection Agency (EPA) could issue NPDES permits to authorize the discharge of pollutants into the waters of the United States, subject to terms, conditions, and limitations set forth in such permits. EPA could also authorize individual States, such as the Commonwealth of Pennsylvania, to issue such permits under authority delegated from EPA. EPA had delegated such authority to the Commonwealth.

8. Effluent limitations, as defined in Section 502(11) of the Act, 33 U.S.C. § 1362(11), restricted the quantity, rate, and concentration of chemical, physical, biological, and other constituents of wastewater discharges. Numerical effluent limitations and narrative restrictions were among the conditions and limitations prescribed in NPDES permits issued pursuant to the Act.

9. Sections 308 and 402(a)(2) of the Act, 33 U.S.C. §§ 1318 and 1342(a)(2), provided that a NPDES permit could also require, among other matters, data and information collection and reporting; the establishment and maintenance of monitoring equipment; the sampling of effluent prior to discharge into a receiving waterway; and the reporting on a regular basis to the permit-issuing authority regarding the permit-holder's discharge of pollutants.

10. The Act regulates, among other things, sewage treatment plants operated by municipal governments and authorities, often referred to as publicly owned treatment works ("POTWs"). The discharge of a POTW's treated effluent into waters of the United States is regulated pursuant to the NPDES permit program.

11. In addition to receiving domestic sewage, POTWs also frequently receive industrial wastewater generated by industrial facilities that discharge into sewer systems. Depending upon the type of wastewater being discharged, a POTW, in accordance with the Act and the NPDES permit program, may be required to make an industrial user pretreat its wastewater prior to discharging the wastewater into the sewer system leading to the POTW, as set forth in 33 U.S.C. § 1317 and 40 C.F.R. § 403.8(f). Pretreatment is intended to protect the sewer system, the safety of workers, and ensure that discharges from industrial users do not interfere with or pass through the operations of the POTW without treatment, thereby protecting the equipment and processes of

the POTW and the biological, chemical and physical integrity of the receiving waters of the United States.

12. The federal pretreatment regulatory program under the Act is set forth at 33 U.S.C. § 1317 and 40 C.F.R. Parts 403, 405-471, and is comprised of four components containing specific regulatory prohibitions and limitations. One of the components involves "local limits" which are developed by individual POTWs and are tailored to address the specific types of pollutants generated by a particular industrial user and discharged to a POTW.

13. One typical kind of a "local limit" requires dischargers to sewer systems to obtain an Industrial User pretreatment permit which contains specific requirements similar to CWA NPDES permits issued under the Act, that is, limits on the quantity, type and concentration of pollutants that may be discharged to the POTW, compliance monitoring, and regular, periodic reporting to the POTW.

14. Such local limits are enforceable by the federal government if they are part of a pretreatment program approved by EPA. 33 U.S.C. § 1342 and 40 C.F.R. § 403.5(d).

## PWSA's CLEAN WATER NPDES AND INDUSTRIAL USER PERMITS

15. On or about November 9, 2009, the Pennsylvania Department of Environmental Protection (PADEP) issued Clean Water Act Permit No. PA0218961 (the NPDES Permit) to the PWSA to regulate discharges from the Aspinwall Plant. Under the NPDES permit, the PWSA was authorized to discharge certain pollutants in limited concentration into the Allegheny River from various locations at the Aspinwall Plant known as outfalls. Each outfall at the Aspinwall plant had a numerical designation. The PADEP renewed the NPDES Permit on or about April 17, 2017.

16. The NPDES Permit authorized the PWSA to discharge only two waste streams from a facility at the Aspinwall Plant known as the Clarifier Building by means of an outfall

designated Outfall 012. The first waste stream consisted of storm water collected from a portion of the roof of the Clarifier Building. The second consisted of partially treated drinking water known as "clarifier blowdown." Clarifier blowdown was generated when the PWSA periodically needed to take a clarifier basin used in the production of drinking water out of service for repair or general maintenance. Clarifier blowdown consisted of the water that was needed to be removed from a clarifier basin in order to repair machinery used to operate each basin 24 hours a day.

17. The NPDES Permit set numerical limits on the amount and concentration of certain pollutants, to include Total Suspended Solids, Oil and Grease, and Total Residual Chlorine, that the PWSA could discharge into the Allegheny River from Outfall 012. The PWSA was also required under the NPDES Permit to monitor wastewater for the presence of certain metals.

18. Part C, Section 4 of the NPDES Permit applied to all of the outfalls identified in the NPDES Permit. Part C, Section 4 specifically prohibited the "discharge of floating solids . . . that result in the observed deposition" of material in the Allegheny River.

19. The PWSA was required to perform periodic sampling of the discharge from Outfall 012, and report those results to the PADEP on a monthly Discharge Monitoring Report (DMR). An authorized representative of the PWSA had to sign each DMR and certify that it was "true, accurate and complete." Each DMR contained a statement above the signature line informing the signer that it was a criminal offense to knowingly report false information.

20. ALCOSAN operated a federally-approved pretreatment program. It issued Clean Water Act Industrial User permit No. P2-2008 ("IU Permit") to the PWSA, on or about October 1, 2015. The IU Permit authorized the PWSA to send up to one million gallons per day of "clarifier residuals," commonly referred to as clarifier sludge, or sludge, to ALCOSAN's wastewater plant for treatment. The PWSA paid an annual fee of $7,200 to discharge the sludge to ALCOSAN.

# THE ASPINWALL DRINKING WATER PLANT

21. The Aspinwall Plant had a design capacity to produce 117 million gallons of drinking water per day, but produced on average 80 million gallons per day. The plant was staffed by salaried and hourly employees working on a 24-hour basis every day of the year.

22. Drinking water production at the Plant began with drawing of raw, untreated water from the Allegheny River. Afterwards, chemicals were added to the water to adjust its pH level and the process by which solids and metals was removed from the water was initiated. The water then flowed under Freeport Road and a shopping center to two large sedimentation basins where solids and debris settled out over time. Water then flowed back to the Aspinwall Plant where it underwent the clarification process. At this stage, chemicals were added to further adjust the water's pH level and promote further settling as the water sat in clarifiers located in a facility known as the Clarifier Building.

23. After clarification, the partially treated drinking water flowed through a series of large filters containing sand and anthracite coal during which additional purities were removed. Periodic adjustments to the waters' pH level were made and disinfectant chemicals were added. Water then flowed to a facility known as the "Clear Well," a storage facility area for finished drinking water. From there, it flowed via gravity under the Allegheny River to the Highland Reservoir and then to PWSA's customers.

24. The Clarifier Building contained four clarifiers, large concrete basins each capable of holding 1.8 million gallons of water. Water flowed in and out of the clarifiers on a continuous basis. The addition of chemicals promoted the generation of clumps of solid material, which eventually sank to the bottom of each basin. These solids were referred to as clarifier sludge or residuals ("sludge").

25. Each clarifier basin contained a variety of mechanical devices primarily located underwater. That machinery would occasionally break and require repairs as determined by supervisory personnel to include the defendant, GLENN LIJEWSKI, at the Aspinwall Plant. A basin would have to be emptied of as much water as possible prior to the beginning of repairs. The removed water was referred to as "clarifier blowdown." The defendant, GLENN LIJEWKSKI, had ultimate responsibility and authority to schedule repairs and oversaw the emptying of a clarifier and the disposal of its contents prior to commencement of actual repairs.

26. The cleaning of a clarifier basin to enable repairs was a time consuming, labor-intensive endeavor. It began with the dewatering process during which staff stopped the flow of water to the subject basin for a period of two days. Once the dewatering process was completed, laborers were lowered into the basin by means of a bucket crane. The laborers used three-inch firehoses to wash the accumulated sludge off the basin's wall and machinery. Cleaning a basin could take several weeks depending on the amount of sludge present and other demands on the laborers' time.

27. After it was removed from a clarifier, the sludge flowed out of the Clarifier Building through an underground pipe to a concrete structure located less than 100 yards from the banks of the Allegheny River. This structure was mostly constructed underground, had a variety of pipe, valves, manual and electronic controls, and other machinery. The Plant's workers referred to this structure as "FM-5," "the vault," or the "sludge pit," or the "ALCOSAN pit." (hereinafter referred to as "FM-5").

28. FM-5 had a pipe leading from it to the Allegheny River and a pipe to a sewer line that led to the wastewater treatment facility maintained by ALCOSAN. The pipe leading to the Allegheny River went to Outfall 012, a permitted discharge point into the river. Another pipe took

sludge generated during the water treatment process and during the cleaning of the clarifier basin during maintenance to the ALCOSAN sewer line.

29. Under the terms of its NPDES permit clarifier blowdown could lawfully be discharged into the Allegheny River. Clarifier sludge could not be discharged into the Allegheny River, but instead had to be sent via the ALCOSAN sewer line to the ALCOSAN facility for treatment.

## UNAUTHORIZED DISCHARGES OF SLUDGE INTO THE ALLEGHENY RIVER

30. On various occasions over a period of years, employees of the PWSA, at the direction of the defendant, GLENN LIJEWSKI, sent the sludge/water mixture generated as a result of the basin cleaning process to FM-5, and then used electronic or manual controls at FM-5 to divert the mixture to Outfall 012 where the mixture flowed into the Allegheny River. The recurring discharges of sludge into the Allegheny River were well known to employees at the Aspinwall Plant, including supervisors at various level, to include the defendant, GLENN LIJEWSKI. On some occasions, the defendant, GLENN LIJEWSKI, personally diverted the sludge/water mixture into the Allegheny River.

31. Such discharges occurred multiple times a year since at least 2010. Plumes of discolored waters and solids, including anthracite coal used in the filters, were visible in the Allegheny River. The anthracite coal was present because it came out of the filters when they were backwashed. Coal then became part of the raw water stream entering the clarifiers. The discharges also contained ferric chloride, a water treatment chemical, which had a distinctive rust color due to its iron content. The PWSA employees observed discolored plume extending several hundred feet into the river.

32. The employees and others also observed the buildup of solids in the Allegheny River. A number of employees referred to the buildup as "Glenn's Island," a reference to the role played by the defendant, GLENN LIJEWSKI, in directing the discharge of water/sludge mixture into the Allegheny River.

## THE SELF MONITORING COMPLIANCE REPORTS

33. The IU Permit required the PWSA to determine the amount of sludge it sent to ALCOSAN on a daily basis through use of a meter. The IU Permit required the defendant, PWSA, to perform compliance sampling and analysis periodically on its discharge to the ALCOSAN sewer system. The PWSA was also required to monitor for a variety of pollutants, including metals, oil and grease, and organic chemicals.

34. The IU Permit required the PWSA to report its daily volume of sludge discharged to ALCOSAN and the results of compliance sampling to ALCOSAN every six months pursuant to a Self-Monitoring Compliance Report ("SMCR"). The SMCR contained the daily amount of sludge being sent to ALCOSAN based on the meters positioned at each of the four clarifier basins in the Clarifier Building and a location referred to by the PWSA as FM-5.

35. Like the NPDES Permit DMR, the ALCOSAN SMCR had to be signed by a representative of the PWSA. Each ALCOSAN SMCR contained a statement warning of criminal sanctions for knowingly providing false information. The PWSA submitted its last relevant SMCR to ALCOSAN on or about July 26, 2019. That SMCR covered the first six months of 2019.

36. The Clarifier Building contained four clarifiers, large concrete basins each capable of holding 1.8 million gallons of water. Water flowed in and out of the clarifiers through pipes on a continuous basis. The addition of chemicals helped promote the generation of clumps of solid material, which eventually sank to the bottom of each basin. These solids were referred to as

clarifier sludge or residuals ("sludge"). Each basin had multiple pipes, valves, drains, and other equipment that permitted the periodic automated removal of sludge and the dewatering of individual basins for maintenance and repairs.

37. After it was removed from a clarifier, the sludge flowed out of the Clarifier Building through an underground pipe to a concrete structure located less than 100 yards from the banks of the Allegheny River. This structure was mostly constructed underground, had a variety of pipes, valves, manual and electronic controls, and other machinery. The Plant's workers referred to this structure as "FM-5," "the sludge pit," "the vault," or "the ALCOSAN pit" (hereinafter referred to as "FM-5").

38. FM-5 had pipes leading from it to the Allegheny River and the ALCOSAN sewer line. The pipe leading to the Allegheny River went to Outfall 012, a permitted discharge point in to the river. Another pipe took sludge generated during the treatment of drinking water and during the cleaning of basins during maintenance to the ALCOSAN sewer line.

39. The PWSA had installed electronic flow meters at FM-5 and on each of the four basins in the Clarifier Building. Plant operators could monitor the meter readings from each of the four basins from a computer located in the Operator control room. For a time, an operator manually took the reading from the meter in FM-5. Operators on each shift manually entered figures into a spreadsheet for the PWSA to use. The PWSA used these numbers to calculate the amount of sludge sent each day to ALCOSAN.

40. The electronic flow meters on basins 2 and 4 broke in or around late December 2014 or early January 2015. The flow meter at FM-5 stopped working at an unknown point in time but was inactive by in or around early 2015. The meters were supposed to be used by the PWSA

to report daily sludge discharges to the ALCOSAN sewage treatment system as required by the PWSA's CWA Industrial User Permit P2-2008.

41. Because the meters were broken, the defendant, GLENN LIJEWSKI, and other PWSA supervisors instructed the Aspinwall Plant's operators to estimate the amount of sludge flow from basins 2 and 4 by using round numbers such as 25,000 gallons for every four hours. Operators then entered these estimates, along with readings from the meters at basin 1 and 3, into a spreadsheet utilized by the PWSA. The numbers generated by these estimates were ultimately submitted to ALCOSAN every six months in the SCMRs. The SCMRs were signed by a representative of the PWSA as being "true, accurate and complete" meter readings.

42. The fact that these meters were broken was known to the defendant, GLENN LIJEWSKI, and other PWSA operators and management at various levels. In and around 2017, federal and state authorities were investigating issues involving lead in drinking water in Pittsburgh. That investigation was focused, in part, on the operation of the Aspinwall plant. The PWSA authorized a Capital Contract for the Emergency Clarifier Repair—Emergency Project No. 2017-322-101-G, in 2017.

43. In each SCMR, the PWSA inaccurately described the amount of time each basin's sludge valve was open. Moreover, the PWSA also falsely stated that its employees "periodically check the calibration of all sludge flow meters to make sure they are within factory limits."

## COUNT ONE

44. From in and around 2010, through and around April, 2017, in the Western District of Pennsylvania, defendant, GLENN LIJEWSKI, and employees of the PWSA, known and unknown to the grand jury, conspired and agreed with each other to commit offenses against the United States, that is:

    a. to knowingly discharge clarifiers residuals, commonly referred to as clarifier sludge, into the Allegheny River, in violation of Clean Water Act Permit No. P00218961, in violation of Title 33, United States Code, Section 1319(c)(2); and

    b. to knowingly violate Clean Water Act Industrial User Permit No. P2-008 by operating clarifier basins with broken flow meters, resulting in the use of estimated rather than metered flow volume numbers in making Self-Monitoring Compliance Reports to ALCOSAN between 2015 and 2017, in violation of Title 33, United States Code, Section 1319(c)(2).

### Manner and Means

45. It was part of the conspiracy that defendant, GLENN LIJEWSKI, and other PWSA employees who supervised PWSA operators and laborers, directed such employees to clean out clarifiers at periodic times so that maintenance and repairs could be performed.

46. It was further part of the conspiracy that the defendant, GLENN LIJEWSKI, and individuals he supervised sent sludge cleaned out of clarifiers to a vault referred to as FM-5 and directed that the sludge be discharged from FM-5 to the Allegheny River via Outfall 012 rather than to ALCOSAN's wastewater treatment facility.

47. It was further part of the conspiracy, that, at times, the defendant, GLENN LIJEWSKI, personally turned valves or used electronic controls to open machinery in FM-5 so that clarifer sludge could be discharged into the Allegheny Rover via outfall 012.

48. It was further part of the conspiracy, that beginning in and around December, 2014, or January, 2015, and continuing through April, 2017, the defendant, GLENN LIJEWSKI, knew that flow meters on clarifier basins 2 and 4 and FM-5 were broken.

49. It was further part of the conspiracy that the defendant, GLENN LIJEWSKI, directed operators to estimate flow on clarifier basins 2 and 4 on a daily basis.

Overt Acts

In furtherance of the conspiracy, the defendant GLENN LIJEWSKI and others, known and unknown to the grand jury, committed and caused to be committed the following overt acts in the Western District of Pennsylvania, and elsewhere:

50. On various dates, defendant GLENN LIJEWSKI and other PWSA employees cleaned out clarifiers or caused the cleaning of clarifiers, sent sludge to FM-5 and opened valves or used electronic machinery to discharge such sludge from Outfall 012 into the Allegheny River.

51. On various dates, a high-level executive of the PWSA directed a lower-level employee to investigate allegations that discharges of sludge into the Allegheny River were occurring.

52. On various dates, a supervisor answerable to the defendant, GLENN LIJEWSKI, known to the Grand Jury as "JP," and not a defendant herein, asked an operator to open valves or use electronic valves to discharge sludge into the Allegheny River.

53. On various dates, PWSA operators used estimated flows provided by defendant GLENN LIJEWSKI and others to calculate daily flow totals being sent from the Aspinwall plant to ALCOSAN, and provided that data to other PWSA employees involved in sending daily sludge totals to ALCOSAN on the Self-Monitoring Compliance Reports (SMCR).

54. On or about February 16, 2016, and January 18, 2017, PWSA employees submitted SMCRs to ALCOSAN containing amounts of sludge sent to ALCOSAN on a daily basis for the prior six months. These reports used estimated flow data for clarifier basins 2 and 4 to calculate the daily flow total which was required to be calculated using working flow meters. PWSA employees failed to disclose in these reports that the PWSA was using estimated flow from two clarifiers to calculate daily totals or that flow meters at clarifiers 2 and 4 and FM-5 were broken.

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO AND THREE

55. Paragraphs 1 through 54 of this Indictment are realleged as if fully stated herein.

56. Each clarifier basin and FM-5 had electronic meters on them to record flow volume being sent to ALCOSAN. The electronic flow meters on clarifier basins 2 and 4 broke in and around late December 2014 or early January 2015, while the defendant, GLENN LIJEWSKI, was in charge of plant maintenance. The flow meter at FM-5 stopped working at an unknown point in time but had stopped recording flow volumes by in or around early 2015.

57. The meters were supposed to be used by the PWSA to report daily sludge discharges to the ALCOSAN sewage treatment system as required by the PWSA's CWA Industrial User Permit P2-2008.

58. The defendant, GLENN LIJEWSKI, knew that the meters were broken, knew that the Aspinwall plant had a CWA Industrial User permit that limited how much clarifier sludge could be discharged daily, and that discharge volume was to be calculated using meters, not estimates.

59. Because the meters were broken, PWSA supervisors, including the defendant, GLENN LIJEWSKI, instructed the Aspinwall Plant's operators to estimate the amount of sludge flow from basins 2 and 4 by using round numbers such as 25,000 gallons for every four hours. Operators then entered these estimates, along with readings from the meters at basin 1 and 3, into a spreadsheet utilized by the PWSA. The numbers generated by these estimates were ultimately submitted to ALCOSAN every six months in the SMCRs. The SMCRs were signed by a representative of the PWSA as being "true, accurate and complete" meter readings.

60. Each SMCR submitted to ALCOSAN by an authorized representative of the PWSA contained sludge flow meter numbers for each day of the relevant six-month period. These

numbers consisted of estimated flow from basin 2 and 4 instead of metered readings from those basins or FM-5.

61. On or about the dates set forth below, each such date constituting a separate count of this Indictment, the defendant, GLENN LIJEWSKI, did knowingly violate a condition in CWA Industrial User Permit No. P2-2008 issued to the Pittsburgh Water and Sewer Authority, that is, the requirement that clarifier residual discharges to ALCOSAN be monitored daily using a meter to record flow rates:

| Count | Date | Document |
|---|---|---|
| Two | February 16, 2016 | SMCR |
| Three | January 18, 2017 | SMCR |

In violation of Title 33, United States Code, Sections 1317 and 1319(c)(2)(A) and Title 18, United States Code, Section 2.

A True Bill,

_____
Foreperson

_____
SCOTT W. BRADY
United States Attorney
PA ID No. 88352